UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| LIPTON-U. CITY, LLC, )<br>)<br>Plaintiff, )<br>)<br>vs. )<br>)<br>SHURGARD STORAGE CENTERS, INC., )<br>)<br>Defendant. ) | Case No. 4:05CV1265MLM |

# MEMORANDUM OPINION

Before the court is the Motion for Summary Judgment filed by Plaintiff Lipton-U. City. Doc. 14. Plaintiff has filed a Response. Doc. 17. Defendant has filed a Reply. Doc. 20. The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). Doc. 6.

## BACKGROUND

In Shurgard Storage Centers, Inc. v. Lipton-U.City, LLC, Case No. 4:00CV1220 the court set forth the facts relevant to the dispute between the parties as follows:

> In 1996, a representative of Lipton Realty, Inc., Torsten Bjerregard, contacted Shurgard to discuss the purchase of three self-storage facilities in the St. Louis area, including the Olive Property. Because the parties were too far apart on price, they did not conduct further negotiations.
>
> In 1998, Lipton Realty made a second offer for the three properties of $12,311,452, of which $6,913,418 was for the Olive Property. The calculation was based on an annual Net Operating Income (NOI) and a 9.5 percent capitalization rate. Shurgard and Lipton Realty continued negotiations, contemplating a possible joint venture and an exit strategy for Lipton's retirement, where Shurgard could eventually buy-out Lipton.
>
> In 1999, Lipton took over negotiations, as Bjerregard's immigration status left him stranded in Europe. Lipton was concerned about an existing environmental

condition on the Olive Property. Thus, the parties decided to lease rather than sell the Olive Property.

On September 14, 1999, Brian Rodan at Shurgard drafted a lease for the Olive Property and circulated it to Lipton and Mike Rowe, the primary negotiator for Shurgard. The lease contained a purchase option provision (POP) for Lipton, which was based on a formula using twelve months of projected NOI and a capitalization rate of 10.

In October, 1999, the parties continued to negotiate the Olive Lease. However, Lipton became increasingly concerned about the economics of the deal and the environmental condition of the property. Lipton threatened to terminate negotiations if Shurgard did not make some significant concessions. He was looking for a 20 percent return. On October 6, 1999, Mike Rowe sent an e-mail to Lipton suggesting a compromise regarding the definition or basis for NOI and forwarded a spreadsheet one minute later. The spreadsheet showed values ranging from $7.5 million to $8.5 million for the Olive property. In his e-mail, Rowe suggested that the parties use a 9.6 percent capitalization rate on an historic NOI using the last six months of business results. Lipton disregarded the spreadsheet because it showed projected NOIs. However, on October 7, 1999, Lipton's secretary forwarded the e-mail to Torsten asking for his comments and indicating that the lease payments would be $654,000. Torsten responded that the proposal was good and, using annualized figures, projected that value of the property would increase from approximately $7.2 M to about $7.9 M in five years.

On October 11, 1999, Lipton responded to Rowe via e-mail, "Your compromise on 9.6% on six months trailing NOI is acceptable." Lipton interpreted this compromise to be a substantial price reduction by using six months NOI instead of twelve months. Shortly thereafter, Lipton phoned Rowe to briefly discuss the offer. During this conversation, Rowe requested that the parties fix the six-month period as either January through June or July through December.

Later that day, Rowe sent the drafting attorney, Rodan, an e-mail confirming the agreement and requesting that Rodan update the lease with the changes. The e-mail also indicated that the lease should apply a 9.6% capitalization rate on the annualized NOI for the latest six month period January 1 through June 30 or July 1 through December 31 multiplied by 2. The NOI was to be determined by applying standard GAAP as consistently applied in the store level reporting utilized by SSCI. Rowe copied Lipton, Mark Hall, and Chris McKay on this e-mail. There are no records indicating that Lipton responded to this e-mail either by phone or by e-mail. In addition, shortly after receiving the e-mail, Lipton asked his secretary to fax it to his attorney, Rex Bertram, with "Rex, FYI" and "Brian is still there" written on it.

On October 12, 1999, Rodan revised the lease pursuant to Rowe's directions. He circulated the updated lease on October 13, which incorporated a capitalization rate of 9.6 percent and a definition of NOI to be based on a set six-month period in

section 2.4 of the lease.[1] However, he mistakenly omitted any language regarding multiplying by two or annualizing the NOI. In the real estate industry, capitalization rates are consistently used with annualized figures.

A few days later, Lipton contacted Rex Bertram to point out that he had successfully negotiated a purchase option price based on six months' unannualized NOI. However, the parties continued to negotiate a portion of section 2.4; specifically the inclusion or exclusion of annual parking space revenue from the calculation of NOI as set forth in subsection (iii). Additionally, the parties renegotiated the fee mortgage provision in section 1.15 of the lease, which provided: This Lease shall be and is subject and subordinate to the lien of any mortgages now or hereafter made affecting all or any part of the fee title to the Property ("Fee Mortgage"). The initial principal amount of a Fee Mortgage shall not exceed seventy-five percent (75%) of the value (based upon appraised value determined by capitalizing the 12 months trailing earnings at the rate of 10%) of the Property at the time of the issuance of the Fee Mortgage.

On October 25, 1999, Shurgard's Board of Directors met to consider the Olive lease proposal. Shurgard provided a copy of the lease draft to each member. Rowe and Rodan also provided a summary page to the members, indicating that the POP would be based on twelve months' trailing NOI. The parties signed the final lease on November 8 and 10 of 1999. The lease term commenced on November 1, 1999 and was to expire on October 31, 2009. The initial annual rent was

---

[1] Paragraph 2.4, Purchase Price of Property, of the Lease provides:

> The purchase price of the Property (the "Purchase Price") shall be equal to NOI (as hereinafter defined) divided by a capitalization rate of 9.6% (i.e. divided by .096). For purposes of this Section: (i) NOI shall be defined in accordance with generally accepted accounting principals consistently applied in standard operational reports; and (ii) the period during which NOI shall be measured shall be the NOI for the Property during the immediately preceding (i.e. immediately preceding the day upon which the Landlord receives the Tenant's notice of exercise) period of January 1 through June 30 or the immediately preceding (i.e. immediately preceding the day upon which the Landlord receives the Tenant's notice of exercise) period of July 1 through December 31; and (iii) in the event that the right to use the 19 Parking Spaces (as described in Section 1.9.3 of this Lease) has been revoked or terminated then NOI shall include the amount of revenues lost as the result of and which would have been earned but for such revocation or termination (as described in Section 1.9.3 of this Lease).

$639,000.00, which amount was based on a property valuation of approximately $7M.

In a July 11, 2000 letter to Shurgard, Lipton expressed his intention to exercise the purchase option under section 2.4 of the lease. He determined the purchase price to be $2,918,102.70. Shurgard promptly rejected this offer and filed the present law suit.

The court in Case No. 4:00CV1220 described the dispute between the parties which was then before the court as follows:

> This action arises out of a Lease Agreement between Shurgard Storage Centers, Inc. ("Shurgard") and Lipton--U. City, L.L.C., through Donn Lipton ("Lipton"). Plaintiff Shurgard seeks reformation or rescission of the purchase option section of the lease based on an alleged scrivener's error. Shurgard alleges that the purchase option section of the lease did not reflect the parties' true agreement on the price or the formula used to calculate the purchase option price for the leased property. Shurgard maintains that the error was due to mutual mistake, or alternatively, that Lipton had reason to know of Shurgard's unilateral mistake, and enforcement of the provision as written would be unconscionable. Lipton, on the other hand, contends that there was no mutual mistake warranting reformation. Further, defendant claims that Lipton did not defraud Shurgard, and the existing contract is not unconscionable. Thus, Lipton contends that rescission is not the proper remedy, as Lipton would be prejudiced because he has changed his position markedly in reliance on the transaction.

After a non-jury trial, the district court rejected Shurgard's mutual mistake and fraud theories and found, based upon the unconscionability of the Purchase Option Provision, that paragraph 2.4 of Section 2 should be rescinded and that "*the remainder of the lease should remain in full effect.*" (emphasis added). Upon affirming the decision of the district court the Eighth Circuit held:

> ... The [district] court found that Donn Lipton should have known that Shurgard intended to annualize the net-operating income because he was copied on the October 11 e-mail detailing the contract terms. The court reasoned that it would be unconscionable to allow Lipton to purchase the Olive Boulevard property at half its value based upon the lack of clarity of the price term. Lipton now seeks reversal of the district court's order of rescission and judgment in favor of Shurgard.
>
> ... [W]e hold the district court was not clearly erroneous in holding that Donn Lipton knew or should have known of Shurgard's mistake. ...

4

> The district court specifically found that the complaint sufficiently stated a claim in equity that the enforcement of the contract, under principles of equity, would be unconscionable. We cannot say that the district court abused its discretion in doing so.
>
> ... The district court did not abuse its discretion in balancing the equities in favor of Shurgard.

Shurgard Storage Centers v. Lipton-U.City, LLC, 394 F.3d 1041, 1044-47 (8th Cir. 2005).

It is undisputed that since the district court issued its Memorandum and Order in Case No. 4:00CV1220 Lipton continued its efforts to purchase the property at issue and that Lipton's offers were rejected by Shurgard. Additionally, it is undisputed that Lipton has requested that the parties arbitrate their dispute over the price which Lipton shall pay Shurgard for the property and that Shurgard has refused and continues to refuse to arbitrate their dispute.

As set forth above, the court, in Case No. 4:00CV1220, excised the purchase option price set forth in paragraph 2.4 of Section 2 of the Lease. Paragraph 2.1 is titled Grant of Purchase Option and states as follows:

> Landlord grants Tenant an option to purchase the Property (the "Purchase Option") on the terms and conditions set forth herein. Provided, that the parties agree to negotiate in good faith **any additional terms** or **conditions not contemplated** by this Section. **In the event that the parties cannot come to agreement on any such additional terms or conditions within thirty (30) business days of Tenant's exercise of the Purchase Option, either party may notify the other that the matter will be submitted for final resolution to a panel of three real estate experts**, each of whom shall be experienced in negotiating agreements for the purchase and sale of the type of property subject to this Lease. Landlord and Tenant shall each select and fully compensate one of these real estate experts and the third shall be selected by the other two and compensated in equal shares by the Landlord and Tenant. The panel's decision will be binding on the parties without further rights of appeal. (emphasis added).

Pl. Ex. A.

In the matter under consideration Lipton argues that the purchase price of the property at issue should be determined by arbitration. In support of this position Lipton states that it is entitled

5

to have arbitrators decide any term of the sale that is not contemplated by the Lease Agreement and that the parties have been unable to negotiate; that while the Lease Agreement originally specified a formula for determining the purchase price, that price was judicially rescinded and, therefore, while the option remains in effect, the Lease Agreement no longer contemplates such a term; and that good faith negotiations have failed to produce agreement on the price term. Doc. 15 at 1.

## THE FEDERAL ARBITRATION ACT ("FAA"), 9 U.S.C. § 1 et seq.:

Congress enacted the FAA to "establish a 'national policy favoring arbitration.'" UHC Mgmt. Co., v. Computer Sciences Corp., 148 F.3d 992, 995 (8th Cir. 1998) (quoting Southland Corp. v. Keating, 465 U.S. 1, 10 (1984)). Congress did intend that commercial arbitration agreements be "'enforced according to their terms.'" Id. (quoting First Options of Chicago, Inc., v. Kaplan, 514 U.S. 938, 947 (1995). Moreover, questions regarding arbitration, including whether it is binding, "'must be addressed with a healthy regard for the federal policy favoring arbitration.'" Mitsubushi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 626 (1985) (quoting Moses H. Cone Memorial Hospital, 460 U.S. 614, 624-25 (1983)). When interpreting an agreement covered by the FAA, "due regard must be given to [this federal policy] and the ambiguities as to the scope of the arbitration clause itself resolved in favor of arbitration." Mastrobuono v. Shearson Lehman Hutton, Inc., 514 U.S. 52, 62 (1995).

"The [FAA] establishes, that as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay or a like defense to arbitrability." Moses H. Cone, 360 U.S. at 24-25. Moreover, where "a court finds that the parties have agreed to submit to arbitration disputes 'of any nature or character' or simply 'any and all disputes,' all questions, . . . will be properly consigned to the arbitrator." Rochdale Vill., Inc.,

6

v. Pub. Serv. Employees Union, 605 F.2d 1290, 1295 (2nd Cir. 1979) (citing United Steelworkers of America v. American Manufacturing Co., 363 U.S. 564, 571 (1960) (Brennan, J, Harlan, J. concurring)).

## DISCUSSION

The Lease Agreement between the parties provides three conditions precedent for the obligation to arbitrate to arise: the presence of an additional term or condition not contemplated, the exercise of the option to purchase, and the demand for arbitration. The court finds that there is no doubt that the excision of the purchase option price, paragraph 2.4 of Section 2 of the Lease Agreement qualifies as an "additional term[]" or "condition[] not contemplated" as defined in paragraph 2.1. Certainly, upon signing the Lease Agreement *the parties did not contemplate that paragraph 2.4 would be rescinded*. Additionally, the undisputed facts establish that *Lipton has exercised its option to purchase* the property and has *demanded arbitration*. As such, pursuant to paragraph 2.1 of Section 2 of the Lease Agreement the parties are bound to submit their dispute regarding the purchase price of the property to binding arbitration.

## CONCLUSION

The court finds that the parties are bound by the Lease Agreement to submit their dispute regarding the purchase price of the property to binding arbitration. The court further finds that the undisputed facts show that Lipton has fulfilled the conditions precedent to requiring Shurgard to submit their dispute to binding arbitration. The court finds, therefore, that summary judgment should be granted in favor of Plaintiff and that the parties should be ordered to arbitrate their dispute as provided by paragraph 2.1 of Section 2 of the Lease Agreement.

Accordingly,

7

**IT IS HEREBY ORDERED** that Plaintiff's Motion for Summary Judgment is **GRANTED**; Doc. 15

**IT IS FURTHER ORDERED** that a separate Judgment incorporating this Memorandum Opinion shall issue this same date.

<u>/s/ Mary Ann L. Medler</u>
MARY ANN L. MEDLER
UNITED STATES MAGISTRATE JUDGE

Dated this <u>20th</u> day of December, 2005.